# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0170-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Appellant/
Cross-Respondent,

v.

S.R. and M.U.,

      Defendants-Respondents.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.R., a Minor,

      Respondent/Cross-Appellant.

_____

Argued January 8, 2019 - Decided February 22, 2019

Before Judges Accurso, Vernoia and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0116-17.

Sara M. Gregory, Deputy Attorney General, argued the cause for appellant/cross-respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Sara M. Gregory, on the briefs).

Olivia Belfatto Crisp, Assistant Deputy Public Defender, argued the cause for respondent/cross-appellant (Joseph E. Krakora, Public Defender, Law Guardian. attorney; Olivia Belfatto Crisp, on the briefs).

John A. Albright, Designated Counsel, argued the cause for respondent S.R. (Joseph E. Krakora, Public Defender, attorney; John A. Albright, on the brief).

Mary Potter, Designated Counsel, argued the cause for respondent M.U. (Joseph E. Krakora, Public Defender, attorney; Mary Potter, on the brief).

PER CURIAM

The Division of Child Protection and Permanency and the Law Guardian for four-year-old Gracie[1] appeal from an August 23, 2017 order terminating the guardianship litigation based on the Division's failure to prove all four prongs of the best interests test, N.J.S.A. 30:4C-15.1(a), at trial. Because we are convinced by our review of the record that the trial court failed to apply the correct legal standard in analyzing certain critical questions in this difficult

---

[1] This is not her real name. We use pseudonyms for the child, her parents and her paternal relatives to preserve her privacy and theirs.

matter, frustrating the paramount goal of permanency, we vacate the order and remand for expedited proceedings to bring this case to conclusion.

Introduction

Gracie's father, Matt, suffers from debilitating mental illness and very serious cognitive limitations. Although the several experts who testified differed as to his exact diagnosis, all agreed, and the court found, that his condition "would prevent him from being a feasible parent for his daughter either independently or as a secondary-parent." The experts, with the exception of the psychologist who testified for Matt, advised he should not be left alone with Gracie, but must be within "line-of-sight" of a competent supervisor. Matt's expert believed Matt could be left alone with Gracie for fifteen or twenty minutes, perhaps increasing to forty-five minutes, so long as a competent supervisor was at all times nearby. Matt's expert testified Matt should never be left at home alone with Gracie.

Gracie's mother Susan is a former heroin addict who the court found "abandoned the care of her daughter to others." Susan failed to comply with any of the services the Division offered, relapsed on heroin while the matter was pending and had not seen Gracie, then two-and-a-half, in fourteen months before the first day of trial, the only day she attended.

Despite concluding neither Matt nor Susan was capable of functioning as Gracie's parent either now or in the foreseeable future, that Gracie's health and development had been harmed by their failures, that "[n]either parent is able to eliminate the harm by their continued failure to provide a safe and stable home for their daughter," and that Gracie "has a secure attachment with the foster parents whom she views as her psychological parents," the judge did not terminate either Matt's or Susan's parental rights. Instead, the judge found the Division proved only the first prong of the best interests standard.

The judge found the Division failed to prove the second prong because "none of the experts testified that removal from the foster parents would cause [Gracie] serious and enduring emotional or psychological harm," and there were "alternatives to termination," namely placing her with Matt's sister Mattie and her fiancé Henry, who were willing to adopt.

Regarding the third prong, the judge found the "myriad of reasonable efforts" the Division made to assist Matt in correcting the circumstances that led to Gracie's placement "proved unsuccessful due to his cognitive limitations and psychiatric disorders." She nevertheless found the Division failed to prove the third prong because it "failed to make reasonable efforts to find alternatives to termination by assessing [Mattie]" and Henry in February 2017, after the

4

Division closed the open case Mattie had with the Division, three months before the start of trial.

As to the fourth prong, the judge found the Division had not shown Gracie "will suffer serious and enduring harm if separated from the foster parents," but only that the Division "believe[s] the foster parents would be 'better' parents." The judge found that although Matt "cannot provide a safe and stable home and safely parent his daughter, the record is replete with credible evidence that the paternal relative, specifically [Mattie] and her fiancé, [Henry] are willing and able to do so." The judge thus concluded it was in Gracie's "best interest to delay permanency for a period necessary to facilitate a plan of effecting permanency with the paternal relatives." The judge did not address the third or fourth prongs as they relate to Susan.

The judge denied Mattie and Henry's application for custody of Gracie under an FD docket, finding that Gracie "requires services of the Division." The denial was "without prejudice until a plan for permanent placement with [Mattie and Henry] can be implemented."

At argument before us in January 2019, seventeen months after the court rendered its decision terminating the guardianship action, counsel advised Gracie remains in foster care with her resource parents, and the court has

recently entered an order directing that Mattie's contact with Gracie be supervised. Although counsel for the Division had previously advised by letter that Gracie's foster parents remain committed to adopting her, at argument Matt's counsel asserted the foster parents have made statements suggesting they do not remain committed to adopting Gracie.

Against that backdrop, we review the facts and the opinions of the several experts adduced at trial. Because both are important here, we relate them in considerable detail.

<u>Matt and Susan</u>

The Division opened this case in August 2014 after receiving a report that Matt and Susan, who was then seven months pregnant, were homeless and sleeping behind a garbage dumpster outside a laundromat in Bayonne, exactly where the Division worker found them. Both Matt and Susan were known to the Division because of prior cases involving their other children had with different partners. None of those children were in their care.

Several months after Gracie's birth in New York that November, the Division received a report that Susan had moved back to New Jersey with Gracie to live with Matt. Finding the couple in a shelter that did not allow children, the Division suspected Gracie was with Mattie, whom the Division knew because

6

of her own open case. When workers went to Mattie's apartment, she initially lied to them about the baby's whereabouts. She finally admitted she was caring for Gracie because Matt and Susan "lie" and were not maintaining appropriate mental health care or housing. The worker and police found Gracie sleeping in the next room. Gracie was being watched by Matt and Mattie's mother, who had her own significant history with the Division.

The worker described the room where the baby was sleeping as completely cluttered with dirty clothes strewn across the floor, making it difficult to move. After confirming there were four adults and eight children living in Mattie's three-bedroom apartment and that Mattie had unresolved "substance abuse and mental health" issues, the Division effected an emergency removal of Gracie.

Although Mattie wished to continue caring for Gracie, the worker advised she could not be considered an appropriate placement so long as she had an open case with the Division. As Matt's mother had a long history with the Division, and was living with Mattie, she was also deemed an unsuitable placement. As no other relatives or friends were willing to assume Gracie's care, the Division placed her with resource parents, a primarily Spanish-speaking couple with two sons, ages two and seven, adopted after placement, where she remained through argument before us.

7

The case proceeded with the Division securing evaluations of Susan, Matt and Gracie to determine what services were appropriate, providing referrals for necessary services and arranging for visitation. Gracie was determined to have global developmental delays and approved for early intervention services in March 2016, providing her with speech therapy, physical therapy and occupational therapy.

At a status hearing in November 2016, the judge asked the Division to obtain the opinion of Gracie's speech therapist as to whether the foster parents' bilingual home was hampering Gracie's speech development. The therapist responded that a greater concern was Gracie's daycare, which she attended weekdays from 8 a.m. to 5 p.m., where only Spanish was spoken. The speech therapist thought an English-speaking daycare might aid Gracie to better understand English and assist in her receptive and expressive communication. All of Gracie's early intervention sessions were being provided in English. The Division responded by moving to enroll Gracie in an English-speaking daycare.

Gracie's pediatrician also referred her to a specialist to consider Fetal Alcohol Syndrome. Dr. Maria Schwab, a specialist in pediatrics and genetics, ruled out Fetal Alcohol Syndrome, diagnosing Gracie as suffering from static encephalopathy, an unchanging brain injury manifesting itself in delays in her

8

motor, communication and adaptive skills. Dr. Schwab testified at trial there is no cure for that condition. Instead, therapies are recommended to address the delays. Schwab testified she had recently made a more detailed diagnosis of Gracie's delay in language skills, terming it mixed expressive receptive language disorder, meaning she had difficulty in making the sounds necessary to form words, putting words together to express ideas or ask for something, and difficulty receiving information, processing it and following through.

Schwab recommended that Gracie continue to receive early intervention program services and then transition to a preschool program for children with disabilities. She expressed the view that Gracie was responding to the therapies and making progress in her communication and motor skills. Neither the parties nor the court asked Schwab her opinion about whether residing in a bilingual home with parents for whom Spanish was their first language affected Gracie's communication skills.

Matt regularly attended supervised visitation with Gracie from June 2015 through trial in 2017, first for three hour sessions once each week with that time increasing to two sessions weekly. Following Susan's move to New York in October 2015, her visits became sporadic, despite the Division's efforts. Susan last visited Gracie in February 2016, fourteen months before trial. The Division

A-0170-17T1

thereafter lost contact with her. New York child welfare authorities advised the Division that Susan gave birth to another child in New York in November 2016, who was removed from her care upon leaving the hospital.

The Expert Evaluations of Matt and Susan

Because both Matt and Susan had prior cases with the Division, a few of the experts evaluating their mental health had the benefit of examining them a number of times over several years. The Division's psychiatric expert, Larry Dumont, evaluated Matt four times between December 2013 and April 2017. Noting Matt's history of psychiatric hospitalizations in adolescence and diagnosis of bipolar disorder, Dumont considered Matt's psychological functioning more impaired than typical for bipolar disorder.

Based on Matt's level of functioning and his failure to improve over the course of the four years Dumont observed him, despite the extent of services provided Matt and his remaining compliant with medication, Dumont diagnosed him as suffering from chronic undifferentiated schizophrenia. Dumont testified that although Matt's schizophrenia had become well-controlled, with medication alleviating "first-order" symptoms such as hallucinations, it would be a permanent impediment to adequate overall functioning. In a report to the Division admitted in evidence, Dumont found Matt likeable and well-meaning

10

but very immature, describing him "almost like a boy playing at being a father." He did not recommend reunification.

Dumont also evaluated Susan on two occasions, the first in January 2016 and again in April 2017, after the first day of trial. On their first meeting, Susan acknowledged a history of heroin addiction, but claimed she had not used in nine years. She was at that time living in New York and working full-time. Susan reported to Dumont that she visited Gracie weekly. He relied on her report to conclude she was committed to her daughter. He found Susan to be of average intelligence, slightly anxious and possessing some insight, although her judgment was "very questionable at times," as when she left a stable setting with her mother in New York to live homelessly with Matt in New Jersey. Dumont's diagnostic impression of Susan included post-traumatic stress disorder, generalized anxiety disorder and borderline intellectual functioning.

Dumont concluded after his first evaluation that Susan's reunification with Gracie was reasonable as "the ultimate goal," but only if she completed parenting training and demonstrated the ability to maintain a stable living situation. He also recommended "something akin to a mentor or a life coach" to provide "life guidance" about "life choices regarding paramours, jobs, and living

A-0170-17T1

situations," plus homemakers "on a regular, ongoing basis." Dumont did not see any sign of current substance abuse or a need for treatment.

By the time Dumont testified at trial, his opinion had changed. Susan had not visited Gracie weekly as she reported. She had only seen her daughter twice in the four months preceding her first evaluation and would see her only one more time between that evaluation and the start of trial. She was living with a new boyfriend, and Dumont found she seemed more committed to her boyfriend's daughter than to Gracie, to the extent of telling Dumont she missed the prior day's court session in order to babysit her boyfriend's child.

Dumont related that Susan had "lots of rationalizations and excuses" for why she had failed to follow through on services necessary to allow her to regain custody of Gracie. He also testified Susan "let it slip" that she had relapsed on heroin in November 2016, as if "well, this is just, you know, the way you deal with stress." Dumont testified Susan's failure to visit Gracie, her shift to a new relationship and her recent heroin relapse led him to conclude that Susan's reunification with Gracie should no longer be the ultimate goal.

The Division presented a psychologist, Gerard Figurelli, who also twice evaluated Susan; the first time in June 2014, when she was four months pregnant with Gracie, and again in July 2015, when Gracie was eight months old.

12

Figurelli reported on both occasions that Susan tested as having average intelligence and adequate judgment, but had a history of not exercising it well. She reported using heroin, sometimes daily for over a year when she was twenty. She claimed she stopped after completing an inpatient substance abuse program.

In her second evaluation, Susan stated she understood Gracie had some developmental delays, and advised Figurelli her plan was to co-parent Gracie with Matt. Following the administration of the parenting stress index and substance abuse screening inventories, Figurelli recommended ongoing testing for substance abuse and counseling to assist Susan in understanding and learning to cope with depression. He concluded Susan was not in a position to parent independently and could not supervise Matt's parenting, in part because of her lack of understanding of his mental health issues and treatment needs. Susan failed to attend appointments for updated evaluations, leaving Figurelli unable to update his findings as to her condition or abilities at the time of trial.

Figurelli evaluated Matt on four occasions over the course of almost four years. He testified Matt suffered from Schizoaffective Disorder, Bipolar Type, making critical that he comply with treatment in order to avoid instability in mood or overall functioning, either of which could be destabilizing. Figurelli testified that medication for bipolar disorder may lose its effectiveness over time

13

and medication for schizophrenic disorders may facilitate no more than a "relatively marginal existence" in which the patient struggles to function in a consistently adequate manner. He advised the court that the nature of Matt's psychiatric illnesses and the limited benefit he had derived from services and mental health treatment made it unlikely he would develop better functioning in the foreseeable future.

Figurelli testified Matt's mental illness had prevented him from achieving any personal stability, "a baseline for being able to parent in a stable and safe manner over time and protect a child from harm." He described Matt's plan, formed shortly before trial, of co-parenting Gracie with his sister Mattie as unrealistic because he could not safely make any independent decisions for Gracie's care and would require "line-of-sight" supervision at all times.

The Division also presented the testimony of Chester Sigafoos who performed a psychological and neuropsychological evaluation of Matt and his parenting capacity in February 2017, two months before the start of trial. Sigafoos reported Matt's intellectual ability as mostly "borderline," describing him as having serious difficulty in thinking logically and coherently and having a "vague and simplistic manner" of processing information.

A-0170-17T1

Sigafoos diagnosed Matt with numerous mental disorders, including borderline intellectual functioning, unspecified neurocognitive disorder, bipolar disorder, unspecified schizophrenia spectrum disorder, post-traumatic stress disorder arising from childhood physical and psychological abuse, histrionic and obsessive-compulsive personality disorders and narcissistic personality features. Sigafoos opined that Matt's numerous conditions and behavioral deficiencies impeded effective parenting, and posed a significant risk of harm to his children if left untreated. He described the conditions as severe, and those concerning executive functioning and intellectual ability "immutable," contributing to an overall poor prognosis. He testified Matt could not eliminate the potential for having false perceptions of reality that would prevent rational and informed decision-making, which in turn could create a risk of harm for any child in his primary care.

The Law Guardian had Matt evaluated by psychologist Antonio Burr in November 2016. Burr found Matt engaging and communicative, albeit somewhat depressed. He reported Matt's memory was adequate, but his responses were short and he had difficulty presenting his life history chronologically. Burr found Matt's reasoning and "social comprehension"

15

adequate, although his insight was "very limited and superficial," and his judgment seemed subject to compromise by stress.

Matt reported five prior psychiatric hospitalizations for suicide attempts starting at age eleven. Burr did not detect signs of psychosis or a thought disorder during the evaluation, but he accepted Matt's diagnoses including bipolar disorder and undifferentiated schizophrenia, "all of which contribute to debilitate and disorganize his capacity to function effectively." Based on assessments he administered, Burr concluded Matt's intelligence was "definitely below average." His inability to complete the Rorschach testing of perceptive-associative functioning prevented his responses from being scored, although Burr "estimated" that functioning to be "extremely limited and poor." Burr concluded that Matt could address ordinary problems, but had only a marginal ability to address complex or novel problems, especially those with compound emotional elements. Matt's responses to the personality and parenting stress indices were too defensive for Burr to draw reliable inferences.

Burr testified that Matt had been struggling over the years to achieve some degree of autonomy and independence, and that his inability to fully care for himself made it very hard to see him as capable of taking care of someone else. He explained the emotional instability characteristic of Matt's mental illnesses

16

created the risk that his feeling stressed or overwhelmed would result in poor focus and attunement to the needs of others, which were obvious detriments to parenting. Burr also concluded that was unlikely to change given Matt's failure to achieve any significant progress in acquiring more autonomy or higher functioning over a fairly long period. He opined that if Gracie had to adapt to such a primary caregiver, it could distort her development and cause substantial regressions. He thus concluded Matt was unlikely to be an adequate primary parent for Gracie.

Matt presented the testimony of a psychiatrist, Howard Gilman, who conducted an evaluation of Matt just before trial. Gilman diagnosed Matt as suffering from bipolar disorder, post-traumatic stress disorder and attention deficit disorder consistent with his history. He concluded Matt had been compliant with psychiatric medication management for the preceding three years and "free of psychiatric symptoms" during that time, even though the Division had provided him only modest amounts of psychotherapy. He reported that Matt presented as calm and communicative, with no mood abnormality, lability or depression. Gilman found Matt's insight and judgment fair, and his use of language and concrete thinking consistent with borderline intellectual functioning. Gilman further opined that the "cognitive limitations consistent

with" borderline intellectual functioning did "not theoretically present a significant impediment to his parenting abilities."

Gilman testified that bipolar disorder can be treated, in part with medication, and that a patient can return to an adequate level of baseline functioning without symptoms, which could not be said for schizophrenic or psychotic disorders. He thought Matt's illness was being appropriately treated and was well controlled, but declined to comment on Matt's parenting capacity without observing Matt and Gracie together.

Matt also presented the testimony of a psychologist, Susan Blackwell-Nehlig, who also evaluated Matt shortly before the start of trial. Blackwell-Nehlig accepted Matt's prior diagnoses of bipolar disorder, post-traumatic stress disorder and attention deficit hyperactivity disorders as credible, but believed his functioning too high to support a diagnosis of schizophrenia. Based on the tests and inventories she administered, Blackwell-Nehlig concluded Matt's intelligence and intellectual functioning were in the below-average range, and he was without any detectable thought disorders.

Blackwell-Nehlig attributed Matt's "poor decision making and lack of understanding" to his "cognitive impairments." She also testified that his deficits in executive functioning, particularly with memory, could account for

18

much of his cognitive impairment. Although testifying that Matt could not serve as a primary caregiver for Gracie because he would continue to need assistance with parenting decisions beyond attending to her basic needs, Blackwell-Nehlig thought he could serve as a secondary caregiver in conjunction with a primary caregiver. She testified Matt could be unsupervised with Gracie, over time, for up to thirty or forty-five minutes, as long as he was in a structured environment and the primary caregiver was available for him to consult as needed. She did not find Matt's diagnosis of bipolar disorder a risk factor as long as it was appropriately treated.

Mattie

At Figurelli's last evaluation of Matt in March 2017, Matt told him his plan was to co-parent Gracie with his sister Mattie. After the Division closed Mattie's case in January 2017, she sought to have Gracie placed with her, and the Division evaluated her for placement. In February, the Division inspected Mattie's new home, a single family dwelling in Carteret, and her family's finances, as any placement or adoption through the Division requires maintenance of a licensed resource home. See N.J.S.A. 30:4C-27.3 to -27.15.

Shana Harper-Neal, a Division resource worker, testified she conducted both the safety inspection and the financial inquiry. Harper-Neal visited the

home on February 17, noting several safety violations but no major flaws. She testified she also worked with Mattie and Henry to complete a household budget form, detailing their monthly income and expenditures. Although Mattie and Henry did not have a mortgage on their home, paying only taxes and insurance, Harper-Neal testified the family's monthly expenditures totaled $2817 and their income was only $2060, leaving a monthly shortfall of over $700 per month. She explained financial capacity was important to the Division because the monthly $900 per child stipend was to be used for the child and not to bridge any shortfall in a resource or adoptive family's finances.

Harper-Neal testified she explained her findings to Mattie and Henry that their home could not be licensed on account of the gap between their income and spending. She testified that Mattie told her Henry had recently received a raise and she intended to earn additional monies by driving for Lyft. Harper-Neal provided her contact information to Mattie and told her she would hold open the file so that Mattie could submit updated paystubs as well as any other proofs she wished the Division to consider. Mattie did not provide any additional documents, and the Division sent her a rule-out letter on March 29, 2017. Mattie admitted receipt of the letter, and that she did not act to appeal the determination.

In response to Matt's plan to co-parent with his sister, Mattie was evaluated by some of the same professionals who conducted other evaluations in the case: Burr for the Law Guardian, Figurelli for the Division and Blackwell-Nehlig for Matt. All testified to facts she provided about her background, which she and Division staffers testified to as well.

Mattie and Matt were raised by their grandmother and an aunt because their parents were addicted to heroin. Their father physically abused their mother as well as both Matt and Mattie. Mattie claimed both her father and paternal grandfather sexually abused her as well. She dropped out of school after eighth grade and was pregnant with her first child at seventeen. She maintained a relationship with the child's father, a man six years older who was abusive towards her, and they had a second child when Mattie was twenty-one. He has since been incarcerated and is now subject to community supervision for life as a sex offender. He is barred from seeing their children.

Mattie currently lives with her fiancé, Henry, who supports her. They have been together for thirteen years and have an eleven-year-old daughter. They also raise Mattie's two older children, sixteen and thirteen at the time of trial. Two of the three children are diagnosed with Attention Deficit

21

Hyperactivity Disorder. Henry has two teenaged children from a prior relationship who often spend time in their home.

Mattie formerly worked as a certified nurse assistant but left that job in 2008 after injuring her back at work. She had back surgery in 2012, which she claimed was improperly performed, leaving her in chronic pain. She subsequently became anxious and depressed to the point of a suicide attempt, resulting in a week-long psychiatric hospitalization that same year. The Division eventually deemed "established" the hospital's allegation that Mattie overdosed on oxycodone, Xanax and cocaine while also using marijuana. Mattie testified that was the only time she ever used cocaine.

Following that hospitalization, the Division opened its case in 2013 and Mattie consented to have Henry or her mother, who was also living with her, supervise her contact with her children. Mattie failed to complete the substance abuse program the Division required, claiming the counselor was overbearing and sexually harassed her. In July 2013, she underwent a second back surgery, which, while helpful, has still left her with chronic pain. She also suffers from panic attacks, although she claims they have become less frequent.

In March 2014, Mattie was hospitalized following an overdose of a prescription muscle relaxant. Her unwillingness to comply with services led the

Division to file a complaint for care and supervision. Mattie testified she declined drug screenings for the sole purpose of getting a court hearing in the hope of finding a path to end the Division's involvement, which she claimed was dragging on with no end in sight. Supervision of her children was ended by court order in March 2015.

In February 2016, the Division referred Mattie to a clinically managed high-intensity residential substance abuse treatment program at Straight and Narrow designed for severe misuse of opiates and benzodiazepine. In March, it referred her to a detox program at Bergen Regional followed by short-term inpatient treatment. Mattie refused both referrals. The Division then referred her to another program, which terminated her after a false positive test result for morphine, and finally to a program she completed successfully in December 2016. The Division closed her case in January 2017. Mattie is maintained on OxyContin, which she takes every four hours, and morphine for pain as needed. She takes Xanax for anxiety and panic attacks, Gabapentin for nerve pain and Imitrex for migraines.

The Expert Evaluations of Mattie

Figurelli conducted his evaluation of Mattie in March 2017, shortly before trial. He had conducted a prior evaluation of her the year before in connection

with her own case. He found, based on the testing and inventories he administered, "integrated with other data, . . . that her parental capacity has, at times, been adversely impacted by her substance abuse and her emotional issues." He found she presented no risk of maltreatment to a child, but opined her problems with chronic pain, the demands of raising three other children, two with special needs, "her history of overdoses when overwhelmed in the past, her early efforts at recovery from her substance abuse/misuse, and her problems with situation-based anxiety — that have not, as yet, been adequately treated" raised concerns about her ability to care for a child of Gracie's age and special needs.

Figurelli concluded Mattie would be "unable to assume an independent or primary caretaking role to [Gracie] without placing herself at risk for an exacerbation of her as yet not adequately treated psychiatric illness," which he characterized as an anxiety disorder. Figurelli testified that although Mattie reported suffering anxiety attacks and regularly took prescribed Xanax to manage anxiety, she was not in psychotherapy to address that condition and its likely underlying causes. He was of the view Mattie would be "at risk for 'self-medicating' substance use; and at risk for her de-stabilization," which would

significantly adversely impact Gracie. He testified that having to closely supervise her brother's contact with Gracie would add further stress.

Figurelli acknowledged that stress and the risk of relapse did not always have a direct correlation, and that in some cases learning to handle additional stress could actually bolster functioning and reduce the risk of relapse. He noted, however, that treatment with a prescription benzodiazepine and an opiate analgesic, as prescribed to Mattie, elevates the potential risk for relapse. He disagreed that adding Gracie and Matt to Mattie's household would not be a significant source of additional stress. He testified one could "reliably say" that adding that sort of stress "won't act as a protective factor. It acts as an exacerbating factor."

Burr also conducted his evaluation of Mattie shortly before trial. He noted Mattie "presents herself as a friendly, engageable and well related person who characterized herself as emotionally stable," but "[s]he has, however, significant physical and emotional issues that may actually or potentially impact on her functioning." Burr characterized Mattie's intellectual functioning as borderline. He opined that her anxiety and pain, which were episodic but chronic, were challenges that could leave her physically debilitated and "emotionally drained"

due to the incomplete relief from her medications, which could certainly affect her ability to care for a young child.

Burr noted that such "legitimate child protective concerns" were what prompted the Division's intervention with Mattie. Although accepting the closing of Mattie's case as proof of the Division's satisfaction that "she was not abusing her medication and the children were not at undue risk," he nevertheless concluded that Mattie can still "be said to have a systemic and structural vulnerability in her functioning" given her anxiety and pain issues.

Burr testified to Mattie's "complicated history" of abuse and neglect at the hands of her parents, her abusive relationship with an older man in her teens and her subsequent significant physical challenges and anxieties. He described as "noble" Mattie's willingness to provide for her parents, who provided her "terrible parenting," to give a home to her brother, who would be otherwise homeless, and to try to gain custody of her niece. He thought "all of this psychologically, clinically, is an attempt to restore something that is good and generous and proper about her family," but concluded it should not come "at the expense of [Gracie]."

Blackwell-Nehlig also conducted her evaluation of Mattie just prior to the start of trial. Mattie reported being prescribed oxycodone for pain, Xanax for

A-0170-17T1

anxiety, Imitrex for migraines and Gabapentin for nerve pain. She reported she no longer felt depressed and was not taking her prescribed depression medications. Mattie reported her panic attacks were infrequent, and that her anxiety was situational and mostly about her children's safety. Although testing revealed Mattie had below-average intellectual functioning with an IQ of 81, Blackwell-Nehlig expressed surprise at that assessment because Mattie's "adaptive functioning skills appear higher."

Blackwell-Nehlig testified she had no concern about Mattie abusing her prescription medication because Mattie was taking medications as prescribed and not taking medications she no longer needed. She found it significant the Division had recently closed its case against Mattie because it suggested the Division no longer had concerns about her ability to parent her children. Blackwell-Nehlig reasoned that if Mattie "can adequately and appropriately parent and provide for her own children, it is anticipated that she could act in a primary parenting role to her biological niece, [Gracie]."

Blackwell-Nehlig testified that Mattie having Matt in her home would not add additional stress for her because "it's her brother, she loves him, and he is able to assist and help in many ways." Blackwell-Nehlig instead opined that Matt's presence "would only strengthen the family in terms of their supports."

Finally, Blackwell-Nehlig testified that Mattie would have no difficulty adding a special needs toddler such as Gracie to her household because, far from being a burden for Mattie, "it fills her soul with joy." Blackwell-Nehlig explained that Mattie "has overcome so many obstacles within her life, and she truly values family, and she does not view anything that she has to do as a mother or for her family as a stressor." She opined "that gives [Mattie] joy, and . . . acts as a protective factor or buffer variable against all of the other things that she, you know, does have difficulty with." Blackwell-Nehlig opined that Mattie was capable of being Gracie's primary parent without supportive services.

The Bonding Evaluations

Burr, Figurelli and Blackwell-Nehlig all performed bonding evaluations. Burr conducted his evaluation of the bond between Matt and Gracie, and Gracie and her resource parents on the same day in November 2016. Burr reported the session between Matt and Gracie did not go well. Gracie, who was almost two, did not want to go to her father and cried inconsolably. While Burr observed that Matt was calm and affectionate, he seemed "defeated," commenting that Gracie did not usually behave that way during their weekly visits. Burr described Matt as passive and unable to overcome Gracie's rejection of him. He noted that despite Matt's weekly visitation with Gracie, he had not developed a

relationship with the child to allow him to respond to her distress. Acknowledging the affection Matt feels for his daughter, Burr concluded "the parental skills to relate to the child weren't really there."

In contrast, Burr found Gracie very comfortable with her resource parents, playing calmly near her foster mother and sometimes handing her the same toys that Matt had used without success to get her attention. When the resource father entered the room, Gracie ran to greet him. Burr noted Gracie was as comfortable playing with him as with her resource mother.

Burr testified Gracie had "a very significant bonding relation" to her resource parents "that satisfies this child's primary, secondary needs." He found "a very poor form of attachment, that probably is an anxious, avoidant attachment" between Gracie and Matt, opining that Gracie did not regard him as a primary parental attachment and did not expect him to satisfy her needs for nurture and safety. Burr found no adequate basis for Gracie to develop a sense of permanency with Matt, and did not believe he had the capacity to mitigate the sense of loss or trauma she was likely to feel from losing her relationship with her resource mother.

Burr testified Gracie would not experience harm in the short or near term if her relationship with her father were severed "because in her awareness, she

29

is not going to perceive a change of situation that is substantial enough." As to the long term, Burr testified "there may be a sense of loss, an emotional space that is unfilled in the sense that she had biological parents and somehow she was not raised by those parents. Something happened that she needs to explore and address."

Burr explained that "doesn't necessarily mean that there will be harm if she has parents who help her, explain and construct a narrative, a life narrative, that is satisfying to her. So that's a possibility, . . . and that happens to kind of all of us. All of us have to construct a narrative about ourselves that we can live with." Burr was of the view the resource parents would be able to address and ameliorate whatever sense of loss Gracie might experience from ending her relationship with Matt.

Just before the start of trial, Burr conducted a bonding evaluation between Gracie and Mattie and Henry. He observed that they were openly affectionate with Gracie, engaging her in play and encouraging her explorations. Burr reported that Gracie appeared content and comfortable with them and positively engaged and responsive to their occasional instructions. When Gracie got tired, she moved to Henry's lap, where she engaged him in continued play with a toy.

Burr opined the quality of Gracie's attentiveness to Mattie and Henry and of her engagement with them demonstrated "some degree of attachment," although not the "ample and secure attachment" Gracie had already achieved by bonding to her resource parents. He explained Gracie did not relate to Mattie and Henry as primary parental figures to provide her with nurture and care. He did, however, see "a good basis for deepening the attachment and bonding at a future date." Burr further testified that Gracie would suffer no harm if her relationship with Mattie and Henry were ended.

When asked at trial about the prospect of delaying permanency with the resource parents in order to permit the development of an attachment between Gracie and Matt and his family, Burr began his response by emphasizing that Gracie is a special needs child. He explained:

> It is difficult to say how much harm or how much loss a child will experience if separated from psychological parents or primary parents. But one can say that the child will experience loss and some degree of harm in the sense that it is likely that the disruptions that will occur will be the kinds of challenge that this particular child may not have the resources to address.
>
> So putting this child in a disruptive parenting situation is significantly more complex than putting an average child in a situation of disrupted parenting. And then you have to consider how much of a bond there is. And this child is clearly — has lived since she is six months old with these parents, and these parents have

31

devoted themselves to her care and developmental advancement.

> So it is a very complex picture. I know that there would be a massive disruption with likely regressions in her development.

Asked directly whether it would be in Gracie's best interests to delay permanency in order to permit Matt "to address his issues," Burr responded by saying, "[i]f the implication of that question is that time is going to change the situation with [Matt], I would not agree with that implication. If the question is about whether there is a benefit in delaying permanency, I don't see it. I don't see what the goal would be. I think this child is in a good place."

When asked whether it would be in Gracie's best interests to delay permanency in order to place her with Mattie and Henry, Burr said no, "this child is a special needs child who needs to achieve permanency. And I think it is fortunate that this child has parents, primary parents, that are addressing those issues and this child is progressing at this point. I, as a psychologist, would not want to disrupt that process in any way." Although acknowledging the importance of biological relationships, Burr testified "the best provision" for Gracie's needs

> in terms of the likely outcomes for her development is in the relationship that she has formed since she was a six-month-old baby to this part of her life where it has

32

been proven in the reality, in the in and out, everyday life, that she has had benign parents who have contributed to her development, especially from the point of view of a globally developmentally delayed child. That is not a small task and that is not a small concept.

Burr attempted to testify that the resource parents advised him they valued a continuing relationship between Gracie and her father's family, with the resource mother explaining that it would make it easier to explain to Gracie as they "go along . . . what the situation is." The judge, however, sustained Matt's objection striking the testimony, stating "[w]e don't have open adoption. I can't consider it."

Burr rejected the notion that Gracie's developmental delays would lessen the impact of separating her from her resource parents, an idea introduced by Blackwell-Nehlig. Burr testified that the assumption that a child of almost three years old "is going to forget her primary parents since six months of age because her brain is not going to mature appropriately is inaccurate and not to say insensitive." Burr opined that

it negates everything that we're addressing here in terms of attachment, the human capacity, the human emotional memory capacity, the question of attachment, the question of how a child constructs, internalizes an image of who her caretakers have been, and how a child . . . constructs an emotional memory of the caretakers, principal significant caretakers.

33

A-0170-17T1

He concluded that "to suggest that this will be somewhat irrelevant to her and that the removal will not cause any harm in the sense of how this child is going to process that is not psychological thinking."

Figurelli performed bonding evaluations of Gracie with Matt, with Mattie, Henry and the paternal grandmother, and with the resource parents, all on the same day shortly before the start of trial. In the session between Gracie and Matt, Figurelli described Gracie as comfortable, but mostly passive and reactive. She was receptive to her father's appropriate verbal and physical expressions of affection, and showed no indications of distress. Gracie engaged in minimal exploratory behaviors in the company of her father. Figurelli deemed that significant because it is indicative of the degree of emotional security a child derives from the presence of a parent or other caretaker. He explained a child with a secure emotional attachment to a parent or caretaker can use that person's presence as a secure base, permitting the child to engage in independent, assertive, inquisitive and exploratory behavior.

When Matt left the room briefly at Figurelli's request, and again at the end of the session, Gracie did not display any reaction from being separated from him. Figurelli opined that the attachment between Gracie and her father was not a fully and reciprocally bonded relationship, and did not, on Gracie's part,

display any evidence of emotional security. Asked if Gracie would suffer any harm from the termination of that relationship, Figurelli responded that she would not suffer any harm in the short term and in the long term only the potential harm any child risks from losing a relationship with a biological parent.

In the session with Mattie, Henry and the paternal grandmother, Gracie, after some initial hesitation, related in a positive and cheerful manner to all three. Gracie was clearly familiar with Mattie and appeared to enjoy her interaction with her. Figurelli described the interaction between Gracie and her paternal relatives as spontaneous and free of any fear or distress on Gracie's part. The independent and assertive behaviors Gracie exhibited were appropriate but limited. The only temporary departure from the room that upset Gracie was Mattie's, but Gracie's grandmother was able to refocus her with play. When Mattie returned, Gracie smiled and reached out to Mattie to pick her up. Several times one of the three adults asked Gracie a question and received an appropriate one-word response in English. At the end of the session, after the adults made affectionate goodbyes, they left without Gracie exhibiting any negative reaction.

Based on his observations, Figurelli opined there did not "appear to be a significant reciprocal emotional attachment or bond" between Gracie and her paternal relatives. Instead, he referred to Gracie's attachment to them as

"limited" and characterized by "an overall positive emotional reaction, comfortability, spontaneity, some familiarity and the absence of fear." Asked whether Gracie would suffer any harm from the loss of her relationship with them, Figurelli opined it would be similar to the loss of a relationship with her father; no short-term harm and only the possibility of a future sense of loss inherent in any adoption. He thought Gracie would suffer little or no harm in the short term "because of the nature and quality of her bond to her current resource parents."

In his session with the resource parents, Figurelli observed that Gracie engaged in a noticeably wider range of age-appropriate independent and exploratory behaviors than with Matt or his family, and she consistently sought to include the resource parents in her activities. Gracie was more verbally expressive, speaking single words and short two-word phrases.

Observing their interactions and how "consistently attuned" and responsive the resource parents were to Gracie's needs as she communicated them, Figurelli opined that Gracie derived a sense of emotional security from the presence of her resource parents, not present in her relations with her father and his extended family. When Figurelli asked them to leave the room, Gracie got upset and quickly moved to the door and tried to pull it open. Figurelli was

unsuccessful in alleviating her distress in their absence. When the resource parents re-entered the room, Gracie displayed her pleasure at their return and immediately calmed down. The resource parents told Figurelli they were committed to Gracie and wished to adopt her.

Figurelli noted Gracie referred to the resource father as "papa," which Figurelli found "developmentally appropriate." He explained that based upon the nature of the bond he observed between them, "in her world, psychologically, he's a parent to her and a significant paternal parental authority figure and caregiver." He described Gracie's attachment to her resource parents as "a developing, significant, reciprocally bonded relationship."

Figurelli testified the bonding between a child and a caretaker that occurs in the first two-and-a-half to three years of the child's life is particularly significant for developing the capacity to trust as well as the child's sense of mastery over her environment. He asserted that disrupting a child's bond to a parent or caretaker puts the child at significant risk of developing any number of childhood disorders, including mood disregulation disorders, impulse control problems and difficulty with forming attachments to others. Figurelli opined that Gracie's "central and primary" attachments were to her resource parents,

and that severing that bond would do "more harm than good in the short term," which Mattie, Henry and Gracie's grandmother would be unable to mitigate.

Figurelli disagreed with Blackwell-Nehlig's assertion that Gracie would likely forget her resource parents if removed from their care because of her developmental delays. Relying on a "considerable body" of neuroscientific, neuropsychological and psychoanalytic literature, he explained that a young, preverbal child such as Gracie stores memories that, although not encoded in language, persist into later childhood and adulthood. Figurelli asserted that were Gracie

> removed from her current caretakers with whom she shares a central attachment at this point in time, she will experience . . . a significant emotional loss as a result of the loss of that relationship. That loss, the impact of that loss and its memory will be stored nonverbally, as I'm suggesting. It will be encoded nonverbally.
>
> The problem with that is that there will be an impact. It will be a memory, it's likely to be traumatic in nature, and when she does acquire language, that memory is the type of memory that will be outside of her awareness because she's not able to put it into language, but inevitably if it's significant it will impact her emotional functioning. It will impact her — potentially her physical functioning, and it may very well impact her capacity to bond with significant others going forward.
>
> And the concern is that when a child is exposed to the trauma of a removal, the question that we ask is

38

can — with services can the impact of that removal be mitigated. The problem is with preverbal experiences and preverbal memories that the typical methods that we utilize to try to address that impact over time and mitigate it is therapy or therapeutic interventions, and just as yet we don't have available to us consistently effective or demonstrated effective therapy methods for removing that impact. So the problem is with the issue of preverbal memories and preverbal experiences is that when there is an impact and it is traumatic it's much more likely to be lifelong in nature.

When asked whether Gracie had the potential to develop a secure and intact bond with Mattie and Henry if she were placed in their care, Figurelli responded:

maybe yes, maybe no. I think the issue becomes risk, . . . and I do believe there's likely to be a significant emotional impact on [Gracie] if she's removed [from] her caretaker, and if that impact is traumatic in nature and if that impact is encoded in preverbal memory and it's very difficult for her to become aware of that impact and for that impact to be mitigated, I would say then that the — it's less likely that she would be able to form a secure bond with another caretaker, and she may struggle with forming attachments and relations during the course of her lifetime because that impact, since it's not accessible to awareness and less accessible to mitigation, is likely to reenact itself compulsively during her childhood and later life. That's the risk that we run.

A-0170-17T1

When asked whether permanency could be delayed in order to afford Gracie the opportunity to see if she could develop a bond with Mattie and Henry, Figurelli responded:

> I think we're beyond the point where — in this particular case I think we're beyond the point where it does not do [Gracie] more harm than good for her to be removed from her current caretakers, and I stated that as a double negative. I hope it's clear what I'm stating. I just think we're beyond that point, unfortunately.

Blackwell-Nehlig conducted bonding evaluations of Gracie with Matt, with the resource parents, and with Mattie, Henry and the paternal grandmother shortly before trial. Recounting the session between Gracie and her father, Blackwell-Nehlig reported that when Matt entered, Gracie "smiled and walked toward him." She let him pick her up, kiss her, carry her into the office and hold her on his lap. He engaged her in playing with toys, and she accepted his help. Matt held Gracie on his lap for half an hour, although she squirmed, tried to get down and repeatedly pointed to objects around the room. He explained, "[s]he is trying to get down and get into things." After Blackwell-Nehlig suggested he put Gracie on the floor with some toys, he did so and assisted her in playing with the toys.

Blackwell-Nehlig defined "bonding" as referring to the parent's feelings for the child, and asserted it occurs in the first hours or days after the child's

arrival. "Attachment" is the child's emotional connection to a parent or caregiver, which develops gradually. She opined a child is capable of developing an attachment starting in the second six months of life, but an attachment can develop at any point "as long as the parent is providing stable, responsive, and consistent care." Blackwell-Nehlig opined that "[p]arents have years to build a relationship with their child." She explained, however, that if an "extended period of time" passes without a stable and supportive parental relationship, the child may "develop significant difficulty trusting others and experience limitations in the ability to form relationships."

Blackwell-Nehlig opined that Gracie had "a positive relationship" with her father, noting she sought his attention, even though he was not her primary caregiver at the time. Although noting Matt "had some difficulty anticipating [Gracie's] developmental needs," evidenced by his keeping her on his lap as she tried to free herself to explore, "he was trying to ensure her safety," attesting to "his acquisition of parenting skills." Blackwell-Nehlig saw Matt as bonded to Gracie "even though he is not the primary psychological parent at this time." As to Gracie, Blackwell-Nehlig opined she "appear[ed] to have an attachment to her father," seeming "to recognize him as a stable yet fluid figure in her life."

Blackwell-Nehlig recommended that Matt "act as a secondary caregiver to an adequate primary caregiver because of his bond and attachment with his daughter." She concluded Gracie "will be able to benefit from a relationship with her biological father," which "would enable a meaningful connection to her family and community." Blackwell-Nehlig opined that Matt, "in conjunction with a primary caretaker from his family," would be able to mitigate any harm Gracie would experience from removing her from her resource parents, adding that Gracie's developmental delays make "her memory at this time . . . questionable" in any event. She further concluded "[a] permanent, secure attachment is anticipated to be developed between [Matt] and [Gracie] (with the assistance of family and recommended services)."

Blackwell-Nehlig conducted her bonding evaluation of Gracie and her resource parents through a translator. The resource mother sat at a child-sized table as Gracie played with blocks, with her resource father sitting nearby. As Gracie put blocks on the table, the resource mother assisted, counting the blocks and identifying colors in Spanish. Gracie was responsive, trying to verbalize and repeat what her resource mother was saying. Gracie moved around the room, taking a stuffed cat from Blackwell-Nehlig and walking back to give it to her resource mother. The resource mother thanked her and spoke to the cat in

Spanish to Gracie's amusement. Gracie then took the cat to show her resource father and returned to the resource mother for a hug. Gracie followed her instructions to return the blocks to their box, as the resource mother counted each one in Spanish. After the blocks were back in their box, Gracie took some out and placed them on a rolling caddy, which she pulled over to her resource father.

Blackwell-Nehlig opined the resource mother understood Gracie's developmental delays, reporting the therapies were assisting Gracie with her walking and speech. The resource mother also reported that Gracie was attending a bilingual daycare program, noting she spoke to Gracie in Spanish and Gracie responded in English. Blackwell-Nehlig opined that Gracie had a positive relationship with the resource parents and a stable and secure attachment to them, which she found unsurprising as they were providing for her "daily needs and acting as primary psychological parents."

Blackwell-Nehlig opined that "[p]ermanency and stability are critical to [Gracie] at this time, and although there is a stable and secure attachment between [Gracie] and her resource parents, there is also an intact, fluid attachment between [Gracie] and her biological family." She concluded the same "stable, secure attachment that currently exists between" Gracie and her

resource parents "could also be cultivated by [Matt's] family if provided the opportunity" and doing so "would facilitate a continued, enduring relationship between [Gracie], her father, and her biological family."

Blackwell-Nehlig opined that:

> [f]urthermore, since memory is contingent upon maturation of the brain and specific experiences, and [Gracie] has developmental delays, her memory at this time is questionable. Thus, if she were removed from the [resource] family, she would likely experience some transitional difficulty as she adjusted to a new environment and primary psychological parents. However, as long as she had the opportunity to develop a secure, attachment, this harm could be mitigated, and in time, she would likely have little or no recall of her resource parents. That being said, it also appears that [the resource parents] would be able to mitigate any harm [Gracie] would undergo if she were no longer able to visit with her father and his biological family. Nevertheless, severing ties between [Gracie] and her father would undermine her sense of identity in terms of her relationship with her biological family.

Blackwell-Nehlig conducted her bonding evaluation of Gracie and Mattie, Henry and the paternal grandmother shortly after her other two bonding evaluations. Henry came from work and joined the session about halfway through. Mattie directed Gracie in a variety of different play activities, engaging her with a puzzle, a drawing tablet and bubbles. Both Mattie and her mother, Gracie's grandmother, praised Gracie when she picked up the correct piece of

44

the puzzle and redirected her when she tried to walk away or touch something she should not.

Blackwell-Nehlig opined that Gracie had a "positive relationship attachment" to Mattie because the two "remained in close proximity to one another and [Gracie] appeared to feel secure." Mattie appeared aware of Gracie's speech delays and spoke often to the child. Blackwell-Nehlig likewise found Gracie had "a positive relationship" with Henry, interacting similarly with him, even though he participated in Gracie's weekly visits only by video conference. She found Gracie had an "adequate bond" with her grandmother, noting Gracie did not object when her grandmother picked her up and smiled when she showed Gracie a stuffed toy and touched her face.

Blackwell-Nehlig opined there was "an intact, fluid attachment between [Gracie] and her biological family" and that Gracie had "the potential" to develop a permanent, secure attachment with Mattie and Henry if they were afforded the opportunity to act as her primary caregivers. She further opined they would be able to mitigate any harm Gracie would suffer from severing her relationship with her resource parents, which Blackwell-Nehlig expected would be minimal because of the effect of Gracie's developmental delays on her memory.

At trial, Blackwell-Nehlig testified she worked with emotionally disturbed children, some of whom were adoptees. She asserted adoptees "often feel rejected by their . . . biological parents," and, as they get older, "may have difficulty with trust or even their own self-concept." Asked what long-term harm Gracie would experience if Matt's parental rights were terminated "and she were to cease having contact with him," Blackwell-Nehlig replied that Gracie "would not have the benefit of — you know, of being a [Matt's family name] and enjoying that identity and understanding that within, you know, her community." She further expressed concern that Gracie could suffer "implicit trauma," which she described as the emotional or behavioral symptoms that arise in older adoptees from the sensory-type recall of being part of their birth family but without the ability to recall anything about their adoption or their family of origin.

Asked about the quality of the attachment between Gracie and her father and his family, Blackwell-Nehlig explained she referred to it as "fluid," meaning not secure, "because her relatives at this time are not her primary psychological parents and they're not — [Gracie] is not in their physical, you know, custody. So it is fluid because it's open, it goes back and forth. You know, she doesn't see them all the time, but when she does there is an established attachment or

46

bond." Blackwell-Nehlig testified that she "believe[d] if [Gracie] had the opportunity to be placed in their care, that that fluid attachment would become secure and permanent." Asked about the harm Gracie would suffer from the disruption of the relationship with her resource parents, Blackwell-Nehlig opined Gracie would suffer "transitional stress, distress. It would be, you know, uncomfortable for her," but would be "something . . . she could overcome" because her biological family "would be able to provide her with consistent care in which she would be able to trust that her needs would be met, and then also solicit that care when needed."

Asked on cross-examination whether her testimony about Gracie's developmental delays rendering it unlikely she would recall her resource parents "cuts both ways," meaning Gracie would likely not remember her father or his family, whom she saw less, Blackwell-Nehlig admitted it would. She added, however, that "children aren't often talking about or asking, you know, why am I not living with my foster parents."

Regarding her testimony that Gracie would suffer harm if she were no longer permitted to see Henry, who was not physically present for visits with the child, the Law Guardian asked, "is it really plausible that a two-year-old would suffer psychological harm by not seeing an individual that she knows

47

from a video app?"  Blackwell-Nehlig  responded that "[t]here really seemed to be a recognition and an attachment" between the two and "in terms of [Henry] individually, you know, I'm really not sure, but I really look at the family as a unit . . . and so in that regard I do think that there would be, you know, short-term damage."

Pressed further about whether she believed a child attending daycare daily "would go through some serious emotional problems not seeing the teacher anymore, seeing the amount of time she would spend with a teacher and at daycare," Blackwell-Nehlig testified a child in that situation would not experience any harm.  Asked why not, she responded, "it's not her family member."  Asked whether Gracie at her age grasped the concept of Henry as a family member or "ha[d] the concept that she's a part of that family," Blackwell-Nehlig responded, "[n]ot at her age, but it is her biological family, and I think she has awareness of her father, and certainly of her aunt.  So I think she has a two-year old's concept of family."  Asked if Gracie had "a concept of the resource parents being her family or not her own family," Blackwell-Nehlig answered affirmatively, stating "I think because they provide primary care that, yes, she would see them as family, also, in that way."

48

The Parties' Arguments

After hearing that testimony, the judge, as noted, found the Division carried its burden only as to the first prong, that Gracie's health or development has been or will continue to be endangered by the parental relationship. The Division and the Law Guardian argue the judge incorrectly applied the law in analyzing prongs two through four, failed to make requisite factual findings as to Susan, and incorrectly shifted the focus from a best interests determination as to Matt's and Susan's parental fitness to whether the Division had proved by clear and convincing evidence that terminating the relationship between Gracie and her paternal relatives would not do more harm than good, in effect extending Matt's parental rights to his sister Mattie. The Division argues the court conflated the placement decision with the determination of parental fitness and, in doing so, incorrectly assigned it a clear and convincing burden to show it was in Gracie's best interests to remain in her foster home, as opposed to requiring Mattie to show that placing Gracie with her would be better for Gracie than remaining in her resource home.

The Division also contends the court was without authority to review its decision to "rule out" Mattie "for cause" in March 2017 after the Division closed her case. The Law Guardian further argues the court ignored that Gracie is

securely bonded to her resource parents, disregarded Gracie's overarching need for permanency and exercised a presumption in favor of keeping Gracie with her father's relatives, whom the Division had ruled out, contrary to the clear policy and laws of this State.

Matt and Susan argue the trial court's finding that termination of their parental rights was not in Gracie's best interests under prongs two, three and four of the statutory test "is entitled to extraordinary deference on appeal," is well-supported and should be affirmed.

Matt further argues because a termination of parental rights trial is different from a best interests hearing, the trial court correctly required the Division "to prove by clear and convincing evidence that severing family ties is in [Gracie's] best interest."

Susan contends the "court did not commit plain error in making a 'de facto best interests ruling' — it simply found [the Division] failed to prove that termination of parental rights was clearly and convincingly in the best interests of [Gracie]" under prongs two through four of the statutory test. Susan further argues "the parents were sufficiently 'separately analyzed' and New Jersey has a policy against the termination of one parent's parental rights."

Our Analysis

Our standard of review is well established. We ordinarily accord deference to the Family Part based on its special jurisdiction and expertise. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998). We defer to the court's factual findings if supported by adequate, substantial and credible evidence in the record. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). The scope of our review, however, is expanded "where the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom." Ibid. (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). Our review of questions of law is, of course, de novo. Nicholas v. Mynster, 213 N.J. 463, 478 (2013); Manalapan Realty, LP v. Twp. Comm. of analapan, 140 N.J. 366, 378 (1995).

We begin our analysis by noting that this was a difficult case, largely because Mattie emerged as a possible alternative to termination only ninety days before the start of trial after the Division closed her case, which had been open for over three years. The case was further complicated when the plan Matt presented at trial, and the one the Division and the Law Guardian responded to, to co-parent Gracie with his sister Mattie, was rejected by all the experts, including his own, as not feasible.

51

That left the court to decide whether it was in the best interests of Gracie, then almost three years old and already in foster care for over two years, to forego the promise of permanency with the resource couple she viewed as her psychological parents in order to explore the possibility of permanency with Matt's sister, thereby keeping alive a family connection. Although we are mindful that a decision that the Division did not prove its case is entitled to enhanced deference because the Division is always free to file a new action seeking to terminate the parents' rights, R.G., 217 N.J. at 553-54, the analytical errors here, and the intolerably long delay in providing Gracie the permanency she deserves, compel vacating the decision and remanding for further expedited proceedings.

"Parental rights, though fundamentally important, are not absolute." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). A parent's constitutional right to raise his or her child is tempered by the State's parens patriae obligation to protect that child's welfare. Ibid. How a court balances those two conflicting ideas is by faithfully applying the statutory best interests of the child standard to the evidence presented at a guardianship trial. Ibid. Termination of a parent's rights to his or her child may be ordered only upon the State's clear and

convincing proof of each of the following four prongs of the best interests standard:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The four prongs of the best interests standard "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Child Prot. & Permanency v. R.L.M., ___ N.J. ___, ___ (2018) (slip op. at 23) (quoting K.H.O., 161 N.J. at 348). As the Supreme Court has often reiterated, "[t]he

considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." K.H.O., 161 N.J. at 348.

The parties do not dispute the trial court's finding that the State carried its burden on the first prong. Based on the testimony of the experts at trial, the judge concluded they were in agreement that Matt "has cognitive deficits and suffers from a diagnosable mental illness that preclude him from independently parenting his daughter. No additional services will alter this fact. They all agree that [Matt] cannot act as the primary parent due to his mental and cognitive deficits." As for Susan, the judge found she had "unresolved substance abuse addiction and has not maintained contact with her daughter."

Considering the first prong of the best interests standard, which the judge characterized as "[w]hether the child's health and development have been or will be seriously impaired by the parental relationship," the judge found it

> clear that [Gracie] has suffered harm because she spent almost her entire life in foster care. [Matt] through no fault of his own is not able to provide a safe and stable home for his child now or in the foreseeable future due to his cognitive limitations and mental illness. [Susan] has not visited her daughter in over a year. She has not complied with any services offered to her including transportation to visit and attend expert evaluations.

54

Based on those findings, the judge concluded the Division "has proven this prong by clear and convincing evidence as to both defendants."

Turning to the second prong, whether "the parent is unwilling or unable to eliminate the harm or . . . provide a safe and stable home for the child and the delay of permanent placement will add to the harm," N.J.S.A. 30:4C-15.1(a)(2), the judge looked to In the Matter of Guardianship of D.M.H., 161 N.J. 365, 379 (1999), for guidance. There, the Court explained that "[w]hile the second prong more directly focuses on conduct that equates with parental unfitness, the two components of the harm requirement, N.J.S.A. 30:4C-15.1(a)(1) and (2) are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." Ibid. The judge further quoted from New Jersey Division of Youth and Family Services v. A.W., 103 N.J. 591, 607 (1986), where the Court explained that a court analyzing the second prong "should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care. No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health."

Although the judge concluded that "[n]either parent is able to eliminate the harm by their continued failure to provide a safe and stable home for their daughter," she nevertheless concluded the Division failed to prove the second prong by clear and convincing evidence by focusing on "whether separating the child from his foster parents will cause <u>serious and enduring emotional or psychological harm</u> to the child." The judge considered the voluminous testimony of the experts as to their bonding evaluations and concluded that because "none of the experts testified that removal from the foster parents would cause [Gracie] serious and enduring emotional or psychological harm," the Division failed to carry its burden on the second prong. That finding was clear error.

As the authorities quoted by the trial judge make abundantly clear, the focus on the second prong is on the parents and their ability and willingness to eliminate the harm inflicted on their child. The court found Susan had abandoned Gracie and that Matt, because of his "cognitive limitations and mental illness," cannot independently parent her and that "[n]o additional services will alter this fact." Those factual findings, that Matt is incapable of caring for Gracie and Susan is unwilling to do so, lead ineluctably to the legal conclusion that the Division carried its burden on the second prong. The judge

listened to the testimony and concluded, in essence, there was no "realistic likelihood that the parents would ever be capable of caring" for Gracie. A.W., 103 N.J. at 614. The Division was not required to prove anything more. See id. at 607 (explaining a court weighing the second prong "should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care").

The statutory language the trial judge focused on in N.J.S.A. 30:4C-15.1(a)(2), that "separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child," is not the test of the second prong. As the statute makes clear beyond any doubt, that the child may suffer emotional or psychological harm if separated from the resource parents is simply among the harms the court may consider in determining whether "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The statute says so clearly: "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2) (emphasis added).

The focus of the second prong is properly on the parents and their ability and willingness to abate the harm requiring the out-of-home placement. See N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209-10 (App. Div. 2007); N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005). The statute's reference to the delay in permanent placement speaks to the time a court can wait for a parent to resume care and custody. See N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). In other words, "whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001).

Because the trial court concluded there was nothing in the record to suggest additional time would permit either Matt or Susan to resume their parental responsibilities, there was no need for the court to have considered whether removing Gracie from her resource parents would itself constitute a sufficient harm to satisfy the Division's burden on the second prong. Accordingly, it was error for the court to assign the Division the burden of proving that separating Gracie from her resource parents would cause her serious and enduring emotional or psychological harm in its proof of the second prong.

The review of the expert testimony the court undertook in the context of the second prong, particularly the bonding evaluations, is one reserved for the fourth prong. See K.H.O., 161 N.J. at 355. We agree with the Division and the Law Guardian that the court's error in analyzing the proofs on the second prong shifted the focus away from Matt's and Susan's ability to resume care of Gracie to whether Mattie would be an appropriate permanent placement for her, thereby injecting Mattie into an analysis where she did not belong. Although we cannot say whether that effectively extended Matt's parental rights to Mattie as the Division alleges, we are confident the error infected the whole of the court's best interests analysis under the statute.

We also agree with the Division and the Law Guardian that the court erred in its analysis of the third prong, whether the Division made "reasonable efforts to provide services to help the parent correct the circumstance which led to the child's placement" and whether there are "alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

The court found, and no party disputes, that the Division undertook "a myriad of reasonable efforts" to assist Matt to correct the circumstances leading to Gracie's placement, all to no avail. Although the court did not make any factual findings with respect to Susan in analyzing the third prong, which is in

itself reversible error, see N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 288 (2007) ("Parental rights are individual in nature and due process requires that fitness be evaluated on an individual basis."), it noted elsewhere in its opinion that Susan failed to visit Gracie, despite being offered bus or train passes, reimbursement for her travel and even having Gracie transported to New York where Susan was living, and found she had "not complied with any recommended services."

The finding the Division and the Law Guardian challenge on the third prong is the court's finding that "the Division failed to make reasonable efforts to find alternatives to termination by assessing [Mattie] and her fiancé, [Henry], after the Division closed her case" in January 2017. We agree with them that there is no support in the record for that finding. Instead, the testimony is uncontroverted that the Division did assess Mattie and Henry in February 2017 after the Division closed Mattie's case. After reviewing their monthly finances, the Division determined a monthly shortfall in their budget prevented licensure of their home under the Resource Family Parent Licensing Act, N.J.S.A. 30:4C-27.3 to -27.15. It accordingly sent Mattie a rule-out letter "for cause" on March 29, 2017, which Mattie did not appeal.

A-0170-17T1

Although we acknowledge the Division and the Law Guardian are correct that Mattie's recourse to that rule-out letter was an administrative appeal pursuant to N.J.S.A. 30:4C-12.1 and N.J.A.C. 10:120A-3.1(b), see N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 83 (App. Div. 2013), and the Division had no obligation to reevaluate her,[2] N.J.S.A. 30:4C-12.1(b), the law is equally clear that the trial judge has the statutory obligation to consider alternatives to termination as part of its analysis under the third prong of the best interests standard, N.J.S.A. 30:4C-15.1(a)(3); N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013).

Accordingly, the court could have appropriately considered whether Mattie and Henry were a suitable alternative to the termination of Matt's parental rights, notwithstanding that the Division concluded to the contrary. Indeed, the heart of this case, although raised only very shortly before trial, was whether Mattie and Henry were a suitable placement alternative for Gracie. The court erred, however, when it criticized the Division (and the Law Guardian) for having "tried to make this case about [Mattie] and her addiction to pain medication because of a botched surgery" when "the only reason the child was

---

[2] Although the Division had no obligation to reevaluate Mattie after ruling her out "for cause" in March 2017, we do not condone the Division's failure to follow the court's order that it do so mid-trial.

not placed with [Mattie] and [Henry]" was "an inadequate assessment of the family finances."

First, there is no basis in the record for the court to have concluded the Division made an inadequate assessment of Mattie and Henry's finances in February 2017. The facts were uncontroverted that Division resource worker Shana Harper-Neal examined their finances and reviewed her findings with Mattie and Henry, explaining the shortfall. Harper-Neal told Mattie the Division would hold open the file to allow Mattie to submit updated paystubs as well as any other proofs she wished the Division to consider. Mattie did not provide any additional information, prompting the Division's rule-out letter the following month.

Second, that rule-out was "for cause" based on Mattie and Henry's inability to meet licensing standards. The issue at trial was whether it was in Gracie's best interests to be placed with Mattie as an alternative to termination. The Division never had to consider whether it was in Gracie's best interests to place her with Mattie in February 2017, because her inability to be licensed prevented the Division from doing so. See N.J. Div. of Child Prot. & Permanency v. K.N., 435 N.J. Super. 16, 37 (App. Div. 2014). Thus it was inaccurate for the court to say that the only reason Gracie was not placed with

Mattie and Henry was because of their finances. The Division's March 2017 rule out certainly did not preclude the Division from joining the Law Guardian at trial in opposing Gracie's placement with Mattie as not in Gracie's best interests in light of Mattie's history, including misuse of prescription drugs and a suicide attempt, as well as the burden of supervising her brother along with her own children in assuming the care of a toddler with special needs.

That brings us to the court's analysis of the fourth prong, whether termination would not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). As the Court stated in A.W., "[w]hile this may appear to be nothing more than a tautological statement, what the concept conveys is that termination of parental rights will result, among other things, in a permanent resolution of the child's status." 103 N.J. at 610. As it explained in K.H.O., the question to be addressed under the fourth prong "is whether, after considering and balancing the two relationships," that is the child and her biological parents and the child and her resource parents, "the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." 161 N.J. at 355. "[G]iven the need for continuity, the child's sense of time, and the limits of our ability to make long-

term predictions, [the best interests of the child] are more realistically expressed as the least harmful or least detrimental alternative." A.W., 103 N.J. at 616.

As noted previously, the four prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. The Court has acknowledged that sometimes in considering whether termination would not do more harm than good, the trial court will be weighing "whether placement with an extended-family member can give the child both continuing nurture and roots," A.W., 103 N.J. at 611, in essence considering the third and fourth prongs in tandem.

Here, the court never considered whether terminating Matt and Susan's rights would not do more harm than good. It short-circuited that inquiry by finding that separating Gracie from her resource parents would not cause her serious and enduring emotional or psychological harm in its analysis of the second prong. In considering the fourth prong the court simply repeated its finding that "the Division has not shown by clear and convincing evidence that the child will suffer serious and enduring harm if separated from the foster parents." In doing so, the court incorporated its error in analyzing the second prong into its analysis of the fourth prong.

The Division never asserted in this case that Gracie would suffer severe and enduring harm if she were separated from her resource parents[3] necessitating termination of Matt's and Susan's parental rights, as was the case, for example in A.G., 344 N.J. Super. at 438, where the time spent in foster care had become "a harm in and of itself," N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 175 (2010) (quoting A.G., 344 N.J. Super. at 434). The Division's case, which the Law Guardian supported, was that Matt, by his inability to care for Gracie, and Susan, by her unwillingness to do so, had caused Gracie harm, which neither could remit despite services, that there was no reasonable alternative to termination and that termination, in light of the relationship Gracie had forged with her resource parents, would not do more harm than good.

The Division's case simply did not rest on proving that Gracie would suffer severe and enduring harm were she separated from her resource parents. It did not need to prove that proposition to carry its burden on the second prong, nor did it need to do so to carry its burden on the fourth prong of proving that termination would not do more harm than good. To be sure, there are cases in which the Division must show precisely that in order to sustain its burden, as in

_____

[3] Although the Division has argued the court prevented Figurelli from offering that opinion, our review of the record does not suggest he was precluded from offering his entire opinion at trial.

In the Matter of the Guardianship of J.C., 129 N.J. 1 (1992). But in J.C., the Division was not asserting that the defendant mother was then unable or unwilling to care for her children, but only that her rehabilitation had come too late, that her children had become bonded to their resource parents, caused by or exacerbated by her conduct, and they faced serious harm if separated from their foster parents. Id. at 8, 25.

Justice Handler, writing for the Court in J.C., explained that when the Division "seeks termination of parental rights, not on grounds of current unfitness but because of potential harm to the child based on separation from a foster parent with whom the child has bonded, the quality of the proof adduced must be consistent with the interests at stake." Id. at 18. Acknowledging that "prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship the severing of which would cause profound harm — a harm attributable to the natural parents and cognizable under the standards set forth in A.W.," the Court nevertheless held it was not enough "[t]o show that the child has a strong relationship with the foster parents or might be better off if left in their custody." Id. at 18-19. Instead, the Division "must prove by clear

and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm." Id. at 19.

This was not a case in which a now fit natural parent was ready to resume custody, forcing the court to decide whether it could return the child to that fit parent without causing her severe and enduring emotional or psychological harm by disrupting her relationship with her resource parents, as in J.C. Here, the Division asserted, and the court found, that neither Matt nor Susan was capable of functioning as Gracie's parent, a situation that was unlikely to change. Because the Division proved Matt and Susan's "current unfitness," id. at 18, it did not have to shoulder the burden the court assigned it to show "by clear and convincing evidence that [Gracie] will suffer serious and enduring harm if separated from the foster parents." The critical question, as in K.H.O., was whether Gracie "will suffer a greater harm from the termination of ties" with her natural mother, father and his extended family "than from the permanent disruption of her relationship with her foster parents." 161 N.J. at 355.

The court never undertook that inquiry. Indeed, we cannot even be sure the court appropriately considered whether Mattie could reasonably serve as a fit parent for Gracie, in light of the court's comment that "[t]he Division tried to make this case about [Mattie] and her addiction to pain medication because of a

botched surgery," when "the only reason the child was not placed with [Mattie] and [Henry]" was "an inadequate assessment of the family finances." Clearly the court was not ready to place Gracie with Mattie and Henry at the time of trial because it denied their request for custody.

What we do know is that recasting the tests on the second and fourth prongs kept the court from having to consider the testimony of the Division's and Law Guardian's experts that terminating Gracie's relationship with her resource parents would result in "a massive disruption with likely regressions in her development" and "a significant emotional loss as a result of the loss of that relationship," and that time had moved "beyond the point where . . . it does not do [Gracie] more harm than good for her to be removed from her current caretakers." While a court is certainly free to reject an expert's testimony, it may not recast an established test to avoid confronting it.

The result of the court having erroneously concluded the Division did not make reasonable efforts to assess Mattie and Henry when it closed Mattie's case in January 2017 and failed to shoulder the burden the court erroneously assigned it to show Gracie would suffer severe and enduring harm from the permanent disruption of her relationship with her resource parents was its conclusion that it could "delay permanency for a period necessary to facilitate a plan of effecting

permanency with the paternal relatives." Although it denied Mattie and Henry's motion for custody under the FD docket at that time, it did so "without prejudice until a plan for permanent placement with [Mattie] and [Henry] can be implemented." It undoubtedly did so thinking the time would be brief, as it found "a short delay of permanency is in the child's best interests."

Whatever the court's intentions as to the time it would take to implement a permanency plan with Mattie and Henry, almost eighteen months have passed since the court dismissed the termination case and Gracie remains in foster care with her resource parents. That means that Gracie, now four years and three months old, has been in foster care for nearly four years. Although counsel could not provide us the reasons for this inordinate delay at oral argument, that delay, coupled with the analytical errors we have discussed, compel us to vacate the order dismissing the termination complaint and remand for reconsideration as to the third and fourth prongs of the best interests standard.

Our Supreme Court has often reiterated "New Jersey's strong public policy in favor of permanency," emphasizing "[t]he trend over the last [forty] years has been towards foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." Id. at 357-58. Whether the court should have initially considered Mattie's failure to

A-0170-17T1

have timely completed services in order to have the Division close her case so that she could be considered a placement for her niece, today there appears little doubt that a permanent placement for Gracie is being delayed by her aunt's inability to safely assume her care. Long-term foster care for a child who had the promise of a permanent placement with resource parents who have provided her nurture and care since she was six months old while the court awaits a paternal relative's ability to safely assume custody is unacceptable.

Accordingly, we reinstate the Division's complaint for guardianship, conclude the Division has carried its burden of clear and convincing evidence as to both parents on the first two prongs, as well as its reasonable efforts to provide services on the third, and remand for consideration, in light of the current situation, of whether there exist alternatives to termination and if Gracie "will suffer a greater harm from the termination of ties" with her natural parents and Matt's extended family "than from the permanent disruption of her relationship with her foster parents" should they remain willing to adopt. Id. at 355.

Susan and Matt shall be considered separately for this analysis. "The mother cannot rely on the father's potential claims and defenses to avoid termination of her parental rights." H.R., 431 N.J. Super. at 228. The court may

A-0170-17T1

direct updated expert reports at its discretion. The court in considering whether termination will not do more harm than good is free to consider any offer by the resource parents to permit continued contact between Gracie and her paternal family. See M.M., 189 N.J. at 288 (considering the resource parents' "willingness to permit continued visitation" as "[i]ntegral to [the Court's] analysis under the fourth prong").

Because the judge who heard the matter has already conscientiously engaged in weighing the evidence and rendered an opinion on the credibility of the witnesses, the hearing on remand should take place before a different judge. See A.W., 103 N.J. at 617. Thus we direct the matter be specially assigned to a new judge for expeditious disposition, which shall occur within the next sixty days.

Vacated and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0170-17T1